Judge Mills
delivered the opinion.
The appellants having obtained a judgment in eject* meot against the appellee, he filed his bill, setting up an entry on treasmy warrant, as the superior equ.table title.
The circuit court sustained his entry; and from that decree this appeal is prayed. His entry is as follows:
“June 29, 1780: James M’Cawley enters 560 acres upon T. VV, adjoining his pre-emption, on the north side, near the Fish pool creek.”
“1784, November 25th: James M’Cawley amends bis entry of 560 acres, vt z: instead of lying on i be north of bis pre-emption, to begin at the N. YV. corner of his settlement, and running with a line thereof to his pre-emption, and with his pre eruption lineN. 15 E. to his eorner^-ikence S. 75 E. 132 poles- — thence N. 15 E. and from the beginning the same course so lar that a cross iiiie at right angles will include the ■quantity.”
The certificate of his settlement is not filed. The entry of his settlement with the surveyor reads thus:—
“1780, Jan. 10th: James M’Cawley enters 400, aeree in Kentucky, by virtue of a certificate, &c, lying on Fish poo! creek, about two miles west of the Fish pools.”
The entry of his pre eruption warrant is not in (he record. It will appear by this statement at once, that the entry of the appellee on treasury warrant, cannot be sustained by attaching it to the locations of bis settlement and pre-emption. His reliance must be on his amended try, which materially changes the calls of the original. This amendment, however, calls for the pre-emption, and his failing to shew this and substantiate its calls, must, according to repeated decisions of this court, be deemed fatal to the entry, considered as resting on this ground. Besides, the Fish pools themselves lie at the head of Fish pool creek, and the stream issuing from them, bears a little east of north. Place bis settlement two miles west, without regard to the call of the creek, and lay bis treasury warrant beside it, and he cannot reach the land in contest. Disregarding the call “west,” and placing it on the creek two miles below the pools, will place him equally as far from the land covered by the appellees. From the settlement entry, then, as a locative call, be can derive no aid.
An entry ralling- for the lines ofa recorded, pannotbesns th'aT s’rf'°' was settled on,unless the identity and the°Hnes are most c'early shewn; such be^made 'to attach to a survey bear-*ubse ^ate to its own date.
The effort of the appellee, however, is not to sustain his-c^a‘m attaching it to the entries of his settlement and preemption, but to their surveys. These are filed, the pre emption was surveyed in three surveys — one of 91 a-eres — the second for 409 acres — and the third 500 acres, adioininc each other, all in the name of James i-rancia, Moore, assignee oí John May, who was assignee ot John Baker, who was assignee of James M’Cawley, and eac*' ^ears da,e ^le 17th October, 17.“6, and are sigur e(l ^y James F. Moore as deputy surveyor, vtiili chain carriers annexed. The settlement survey is in the name of Jag> M’Cawley himself, the appellee, but i! bears d te Oct°l)er 30, 1782, and is signed by the same depuiy surveyor, This statement may at once appear to defeat the aitempt of attaching the treasury warrant amended entry to these surveys» not oilb’ different in name, but about two year* later in date. To obviate this, however, the complainant below ha* shewn that the Fish pools were notorious; that James Francis Moore settled at ornear them in the spring 1784, claiming under the appellees pre eruption, and that the appellee himself settled on the territory now covered either by bis patent settlement or pre emption, and has continued to reside (here ever since: That a trace, notorious and much travelled previous to the date pf the amended entry, passed from Louisville to Man’s lick, crossing Fish pool creek, and through the same territory. The above facts appear to be satisfactorily established. In addition to these, the appellee has attempted to prove that although the surveys bear such a modern date, yet they were in fact made prior to the date of his amended entry, and were notoriously known as such to those conversant in the viciniety, and that thus they ought to be supported as good locative calls. The court has been led attentively to consider the facts in the cause to see how far he has been successful in this attempt, before a decision upon the effect cf it. The circumstance of persons being settled on a located claim, holding under it, would no. doubt attach to it a kind of indefinite and uncircumscribed locality, even without a survey, and others conversant in the vicinity would be led to conclude, that on the surrounding territory the claim was laid But this will not dispense withihe fact cf actual demarkation or its identity, and not onlyihe body of land, but the demarcation itself ought to he noto-rioss, and identified, especially when no publie «See, but *575 Ihe knowledge of individuals alone, could furnish the courses and distances of the survey, and all the means of find-in" it The date of the surveys ought to be taker, at least as prima facie evidence of the time they were made. It was the duty of the officer to return them in three months after making; if this is not done, it., raises á presumption that they were either private or inofficial, or that the party intended hot to be bound bv the work, but to alter and change them, or that some other reason existed for detaining them, which render them precarious and uncertain as locative calls, unless they were completely identified by proof. For these reasons, the fact of the existence of these surveys, at the date of the complainant's entry, and of theitf identity with the calls now claimed, as well as the fact3 of being easily found, and of the demarcation being notoriously known by his name, ought to be clearly aud satisfactorily made out in proof to sustain such calls as good. To prove these facts, H'e appellee produced Mrs. iVloore, widcw of the )a e col. J. F. Moore, who deposed, that in January or February. 1783, her husband, cols. Pope and Floyd and John May, and some others, went, as she understood, into the neighborhood of the Fish pools to survey, and colonel Moore t<dd her that they were surveying M’Cawley’s preemption: That they were absent about one week: That she understood May was to have^part of the pre-emption, ánd col. Moore, on the same tour, purchased it from him by exchanging other lands. That the summer 1784, Colonel Moore shewed her four of the lilies of the pre-emption, among which was the division line between her husband and M’Cawley S‘ e states nothing of the plainness of the lines, and the facility with which they could be followed. She was not taken on the ground to identify them as the Sines now claimed. She professes no knowledge of the settlement survey, and speaks nothing of the notoriety of e¡¿ tiler survey.
Brooks lived in the neighborhood and appears id have knowledge of Moore’s Sf M’Cawley’s residence, and also it may be inferred from his deposition, that he had an understanding M’Cawléy’s settlement and pre-emption was believed to be at their residence And at first blush his answer to at least one ingenious question might induce a beliefthat he knew of the surveys. He is asked, “could you so have directed a subsequent locator on the 25th of Nov. 1784. that be could have found James M’Cawley’s *576 settlement and pre eruption, where he lived, and said Fist» pools and Fish creek ? He answers, “ 1 could.’ He had detailed his knowledge of the residence of M’Cawley, of the Fish pools and creek, positively, by direct answers before, but not one word of his knowledge of a survey being made, or its identity, is pretended by him. The former objects are artfully coupled with the settlement and pre-emption and without attending to the difference between them and the objects of which he had clear knowledge, he has incautiously answered in the affirmative. From his deposition, then, we cannot say that he had knowledge of the fact that a survey exis'ed, or that it was notorious. The annulations of the trees, on some of the lines, but on how many lines and how many trees, or ia what lines, does not appear, for the purpose of proving the early existence of the surveys is resorted to. This species of evidence may often be entitled to great weight, as that which arises from the progress of nature itself, without danger of corruption. But in this instance, altho’ it renders it probable that the surveys were made a little earlier than their date, it does not shew, with any degree of certainty, that they were made as early as the complainants entry. Nor does this evidence, all taken together, attach reasonable certainty to this fact, or that the fact was then notorious. ⅜
The ¿imitations of iine trees is entitled to great weight, as evidence of the time when a sup» Was made
The only remaining witness is Joshua M’Cawley. He is the son of the complainant. This circumstance may go to bis credit, but not to his competence. His deposition is taken three times. By comparing them together we cannot help saying that he has destroyed his own credit. In his first deposition, taken the 5th of February, 1314. after answering some interrogatories about one of the corners of 'he settlement, he is asked, “ how long has it been since you first saw the above corner ? He answers, between eighteen and twenty years. Again, “ how iong has it been since you knew that there was a marked line from that corner ? Ans. Between seventeen and nineteen years. These answers, at the extent, fixes bis knowledge of this settlement corner not earlier than the year 119-1. The cause, however, progresses till 1817, and the difficulty of proving the desired facts seems to increase, and the want of I hem may be fatal. At this critical period, in a new deposition, he swears positively to all that is wanting i« answer to the following interrogatories — —I. Was «r wsts *577 a«f James M’Cawley’s settlement and preemption surveyed, and the lines and corners run and marked On and before the 2oth day of Nov, 1184 ? Ads. They were. — Was cot the sard settlement and preemption at the fish pools gene ally and well known, and Could they not have been easily found by a subsequent locator, and particularly, could not the said settlement and pre-emption have been shewn by Gol, J. F. Moore and others living at the fish pools, and near and adjoining the lands? Aos. Yes: They were well known and could have been shewn by 8aid Moore and others ! How long have you a distinct recollection of the said settlement and pre-emption being surveyed ? Ans. Between 32 and 33 years Í Such a conflict between depositions of different dates, without any reasonable means of accounting for it, must destroy the credit of both. We, therefore, disregarding bis testimony, and believing he never saw marks made on line or corner, and that he was ignorant of their existence at a more early period than that fixed fay his first deposition, lay his testimony aside and rest it on that before recited. It is also Worthy of remark that there are other witnesses sworn, who knew the objects in the neighborhood,' at a more early date than the entry, and they are wholly silent as to the fact of the existence of surveys, and their identity, and also the reputation of such a fact. Testing the case then by the rule before intimated, that in the case of a survey not recorded the fact of its existence and identity with the objects now claimed, as well as its actual notoriety, ought to be elearly made out at the date of the adjoining entry, to furnish such entry with a good locative call, we conceive that the appellee has failed to comply with it, and consequently that the decree of the court below in his favor is erroneous and must be reversed with costs and a mandate issue to dismiss his bill with costs.